**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
UNITED STATES,

        -against-

                                       **MEMORANDUM OF**
ANDRE CHANDLER, also known as       **DECISION & ORDER**
Mac Dre,                                  15–CR–131 (ADS)

                       Defendant.

---------------------------------------------------------X

**APPEARANCES:**

**The Law Office of Kevin J. Keating**
*Attorney for the Defendant*
666 Old Country Road
Garden City, NY 11530

**The United States' Attorneys' Office, E.D.N.Y.**
610 Federal Plaza
Central Islip, NY 11722
       By: Lara Treinis Gatz, Assistant U.S. Attorney

**SPATT, District Judge**.

On June 16, 2015, the United States filed a superseding indictment against the Defendant Andre Chandler, also known as "Mac Dre" (the "Defendant"), charging him with: (a) one count of conspiracy to distribute cocaine and heroin in violation of 21 U.S.C. § 841(a)(1); (b) one count of discharge of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A); (c) three counts of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1); and (d) two counts of possession of cocaine base, heroin, oxycodone, and hydrocodone in violation of 21 U.S.C. § 841(a)(1).

Presently before the Court is a motion by the Defendant pursuant to Federal Rule of Criminal Procedure ("Fed. R. Crim. P.") 12(b)(3)(C) to suppress (i) evidence recovered during a January 13, 2015 search of his alleged residence; (ii) identification evidence offered by two

individuals who separately identified the Defendant as the shooter during a December 13, 2014 incident; and (iii) a statement purportedly made by the Defendant to law enforcement officials following his arrest on January 13, 2015. In the alternative, the Defendant seeks an evidentiary hearing as to all three issues.

On January 5, 2016, the Court scheduled an oral argument on the Defendant's motion. However, the Defendant did not appear at the conference, and the Court adjourned the argument to February 12, 2016.

On February 12, 2016, the parties again appeared before the Court, this time with the Defendant present. They did not add anything beyond what was already contained in their motion papers.

For the reasons set forth below, the Court grants in part and denies in part, the Defendant's motion.

## I. BACKGROUND

The following facts are drawn from the charging documents unless otherwise noted.

On May 15, 2003, this Court sentenced the Defendant to a term of imprisonment of seventy-eight months and five years of supervised release after he plead guilty to possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1). (See 2-cr-938, Dkt. No. 17.)

Significantly, the Court required as a condition of supervisory release that the Defendant "submit his person, residence, vehicle or place of business to a search if the Probation Department has reasonable belief [that] contraband is present." (See id.)

On August 31, 2012, the Defendant was arrested and pled guilty to two violations of the terms of his supervised release for criminal possession of a narcotic drug in the fourth degree and assault with intent to cause physical injury to an officer. (See id. at Dkt. Nos. 19, 36.)

On October 5, 2012, this Court sentenced the Defendant to twenty-four months of incarceration and an additional thirty-six months of supervised release. (See id. at Dkt. Nos. 28, 31.) As part of that sentence, the Court reinstated the terms of the supervised release it previously imposed on the Defendant on May 15, 2003, including the term requiring the Defendant to submit his residence and vehicle to a search if the Probation Department has a reasonable belief that he possesses contraband. (See id. at Dkt. No. 31.) In addition, the Court added certain "standard conditions of supervision," including, "the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer." (Id.)

On July 25, 2014, the Defendant was released from custody and placed on supervisory release. (Compl., 15-cr-131, Dkt. No. 1 ("Compl."), at ¶ 2.)

Immediately following his release, the Government alleges that the Defendant "began to sell crack cocaine in Hempstead, New York." According to a confidential informant ("CI #1"), the Defendant "put out the word" that "no one else was to sell crack cocaine in or near South Franklin Street and Linden Avenue because that was his (Chandler's) territory." (Id. at ¶ 3.)

According to the criminal complaint, on December 13, 2014, John Doe, an individual whose identity is known to the Federal Bureau of Investigation ("FBI"), was selling crack on Linden Street in Hempstead. (Id. at ¶ 4.) Allegedly, at approximately 3:40 am, the Defendant, who was driving a mustang, "pulled up to John Doe and beckoned John Doe over to the car."

(Id.)  The Defendant then allegedly "pulled out a 9mm firearm and discharged the weapon, striking John Doe twice in the lower abdomen and legs."  (Id.)

Later on in the morning of December 13, 2014, a second confidential informant ("CI #2") allegedly heard the Defendant brag that he "put two" in John Doe.  (Id. at ¶ 6.)

On December 29, 2014 and February 19, 2015, respectively, CI #1 and CI #2 reviewed a photo array with six individuals, including the Defendant, and separately identified the Defendant as the individual that shot John Doe twice.  (See id. at ¶¶ 5, 6; Keating Aff., 15-cr-131, Dkt. No. 22 ("Keating Aff."), at ¶ 20.)

It is undisputed that on the morning of January 13, 2015, an unspecified number of U.S. Probation Officers and New York City Police Department ("NYPD") Officers, conducted a warrantless search of the Defendant's alleged residence at 179-55 Anderson Road in Queens, New York, and the Defendant's alleged vehicle, a white Chrysler.  (See Keating Aff. at ¶ 4; Keating Aff., Ex. E, at ¶ 3.)

It is also undisputed that the Officers discovered the following evidence during the course of executing the search: (i) a loaded 9mm Smith & Wesson handgun located under a mattress in a child's bedroom; (ii) a loaded 9mm Taurus handgun and an imitation pistol located inside a safe in the Defendant's alleged bedroom; (iii) a bag on the floor of the Defendant's alleged bedroom containing 80 glassines of heroin; (iv) a set of car keys and safe keys located inside a nightstand in the Defendant's alleged bedroom; (v) a loaded .40 caliber handgun and digital scale located inside the center console of the Defendant's alleged vehicle; and (vi) five glassines of heroine, forty-four oxycodone pills, 3.4 grams of cocaine, and eight loose hydrocodone pills, all of which were found in the driver's side door panel of the Defendant's alleged vehicle.  (See Keating Aff. at ¶ 4; see also Keating Aff., Ex. E.)

4

However, there are factual disputes regarding the circumstances leading up to the search. In a letter filed in opposition to the Defendant's motion to suppress the evidence described above, the Government alleges that on January 7, 2015, Probation Officer Dennis Stickley ("Stickley"), interviewed the Defendant's estranged wife, whose name is not provided by the Government, and CI#1.  (The Gov't Opp'n Ltr, Dkt. No. 26 ("Gov't Opp'n Ltr."), at 3.)

The Defendant's wife allegedly told Officer Stickley that on January 1, 2015, the Defendant confronted her and her new boyfriend and told them that he "runs this city" and "shifted his hand in the area of his waistband, purposefully giving the impression that he was carrying a firearm."  (Id.)  In addition, CI #1 allegedly told Officer Stickley that on January 4, 2015, the Defendant flashed a gun in front of him and CI #2, both of whom allegedly witnessed him shoot John Doe on December 13, 2014.  (Id.)

Finally, according to the Government's letter, on January 12, 2015, Officer Stickley received a text message from the Defendant's wife informing him that on January 11, 2015, the Defendant "pistol-whipped" a member of the Crypts Gang.  (Id.)

According to the Government, the U.S. Probation and NYPD Officers decided to search the Defendant's alleged residence on January 13, 2015 based on the information allegedly provided to Officer Stickley by the Defendant's wife and CI #1.  (Id.)

Other than the assertions in the Government's letter brief in opposition to the Defendant's suppression motion, the only evidence pertaining to what the Government knew prior to searching the Defendant's alleged residence is a document entitled, "EDNY Search Enforcement Team Pre-Search Briefing."  (See Keating Aff., Ex. D.)  That document details the Defendant's criminal history, including a "history of firearms possession."  (See id.)  It also states:

> We will be searching for firearms, ammunition and other firearms-related items. The search will encompass the entire house, which is a two-story, three bedroom,

two bathroom residence with a kitchen, a living and dining area on the first floor.
The home also has a full basement.

(Id.)  However, there is no mention in this document of the allegation that the Defendant shot

John Doe on December 13, 2014, nor the information allegedly provided to Officer Stickley by

the Defendant's wife and CI #1.

For his part, the Defendant disputes that the U.S. Probation and NYPD Officers who

searched his alleged home on January 13, 2015 had reasonable grounds to suspect him of

committing a crime.  (See Keating Aff. at ¶ 12.)  However, the only evidence that he offers to

support this assertion is the affidavit of his attorney, Kevin Keating, Esq. ("Keating"), and his

own affidavit, which recounts the undisputed facts that both NYPD Officers and U.S. Probation

Officers were present during the search of his home:

> Immediately prior to my arrest, numerous members of law enforcement had
> entered the residence and commenced a search of the residence.  The law
> enforcement personnel included several members of the United States Department
> of Probation and several members of the New York City Police Department.

(Chandler Aff., 15-cr-131, Dkt. No. 22, Ex. 1 ("Chandler Aff."), at ¶ 3–4.)

Following the discovery of the evidence described above, the NYPD Officers arrested the

Defendant.  (Id. at ¶ 4; Gov't Opp'n Ltr. at 3.)

There is also a dispute of fact surrounding a purported statement made by the Defendant

following his arrest.  According to the Government:

> while at the precinct, the defendant asked the police officer in possession of the
> cell phone recovered from his vehicle if he (Chandler) could make a call.  The
> officer then asked the defendant, in sum and substance, whether he wanted to use
> his . . . cell phone.  The defendant responded, in sum and substance, that the
> phone is only WiFi (meaning had no cellular service) and can't make calls.

(Gov't Opp'n Ltr. at 7.)

The Defendant offers a slightly different version of these events:

> After purportedly recovering the contraband from the vehicle, a member of the New York City Policy Department brought the cell phone to Chandler who remained detained in his residence and asked Chandler, 'whether he wanted to use his cell phone' . . . , to which Chandler allegedly responded, 'the phone is only WiFi and can't make calls.'

(Keating Aff. at ¶ 6.)

On March 9, 2015, the Government filed a criminal complaint against the Defendant, charging him with knowingly and intentionally using and carrying a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). (See Compl.) The charge was based on the allegation that on December 13, 2014, the Defendant shot John Doe. (See id. at ¶ 4.)

On March 19, 2015, a Grand Jury returned an indictment against the Defendant charging him with one count of conspiracy to distribute cocaine base between July 2014 and January 2015; and one count of knowing and intentionally using and carrying a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). (See Indictment, 15-cr-131, Dkt. No. 3, at ¶¶ 1–2.)

On June 16, 2015, a Grand Jury returned a superseding indictment against the Defendant. The superseding indictment included the previous two counts arising from the December 13, 2014 shooting and the conspiracy to distribute cocaine. It also added three counts of felon in possession of a firearm in violation of 18 U.S.C. § 922(g); one count of possession with intent to distribute cocaine base, heroine, oxycodone, and hydrocodone in violation of 21 U.S.C. § 841(a)(1); and one count of possession of heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1). (See the Superseding Indictment, 15-cr-131, Dkt. No. 14 (the "Superseding Indictment"), at ¶¶ 3–9.)

These additional five counts are based on the firearms and drugs allegedly recovered by the U.S. Probation and NYPD Officers during the January 13, 2015 search of the Defendant's purported residence and car. (See id. at ¶¶ 3–9.)

In addition, the superseding indictment provides notice that in the event of a conviction on any of the charged offenses, the Government will seek forfeiture pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c) of the firearms recovered during the January 13, 2015 search. (See id. at ¶¶ 10–11.)

As noted above, the Defendant seeks to suppress, or in the alternative, an evidentiary hearing with respect to the following evidence: (i) the drugs and firearms recovered during the January 13, 2015 search; (ii) the identification evidence of CI #1 and CI # 2, who identified the Defendant as the individual who shot John Doe on December 13, 2014; and (iii) the statement allegedly made by the Defendant to NYPD Officers, "the phone was WiFi only and can't make calls."

Below, the Court will address whether suppression or an evidentiary hearing is warranted with respect these three categories of evidence.

**II. DISCUSSION**

**A. As to the Evidence Recovered During the January 13, 2015 Search**

As noted above, on January 13, 2015, U.S. Probation and NYPD Officers entered the Defendant's alleged home without a warrant and recovered drugs, firearms, and a set of car keys. Subsequently, the Officers used the car keys to open the Defendant's alleged car, whereupon they discovered additional firearms, drugs, and a digital scale.

The Defendant contends that the Government violated his Fourth Amendment rights against unreasonable search and seizures because the Officers did not have "reasonable

suspicion" that he was committing a crime prior to searching his residence, and therefore, any evidence discovered in his alleged residence should be suppressed and any evidence discovered in his purported car should be suppressed as fruit of the poisonous tree. (See Keating Aff. at ¶¶ 11–13.) The Defendant also asserts that the January 13, 2015 search is prohibited under the "stalking horse" theory, which holds that a probation officer may not use his authority to help other law enforcement officials conduct a warrantless search to evade the requirements of the Fourth Amendment. (See id. at ¶ 14.) Finally, in the alternative, he asserts that he is entitled to an evidentiary hearing because there are disputed facts as to the validity of the January 13, 2015 search. (See id. at ¶ 13, 18.)

In response, the Government contends that (i) the federal probation officers had reasonable suspicion to believe the Defendant possessed a firearm and therefore, the search was valid under a supervised release exception to the warrant requirement; and (ii) the "stalking horse" theory has been rejected by the Second Circuit. (The Gov't Opp'n Ltr. at 4–5.) The Government did not address the Defendant's request for an evidentiary hearing.

The Court will address the parties' respective positions below.

**1. The Legal Standard**

The Fourth Amendment enshrines "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It is a "'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" Brigham City, Utah v. Stuart, 547 U.S. 398, 403, 126 S. Ct. 1943, 1947, 164 L. Ed. 2d 650 (2006) (quoting Groh v. Ramirez, 540 U.S. 551, 559, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004)). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to

certain exceptions.  Id. (citing Flippo v. West Virginia, 528 U.S. 11, 13, 120 S.Ct. 7, 145 L.Ed.2d 16 (1999) (per curiam)).

If evidence was directly or indirectly obtained in violation of the Fourth Amendment, the exclusionary rule sometimes forbids its use at trial.  See United States v. Cacace, 796 F.3d 176, 188 (2d Cir. 2015)  ("When applicable, the exclusionary rule 'reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'") (quoting Segura v. United States, 468 U.S. 796, 804, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984)).

On a motion to suppress evidence, once the Defendant shows that the Government official was acting without a warrant, "the government has the burden of showing that the search was valid because it fell within one of the exceptions to the warrant requirement" of the Fourth Amendment.  United States v. Perea, 986 F.2d 633, 639 (2d Cir.1993); see also United States v. Davis, No. 14-CR-0567 (MKB), 2015 WL 3990514, at *4 (E.D.N.Y. July 1, 2015) ("Once the defendant has shown [that a government official acted without a warrant], the burden shifts to the government to demonstrate that the search or seizure did not violate the Fourth Amendment.") (citing United States v. Herron, 18 F.Supp.3d 214, 221 (E.D.N.Y.2014)).

"'[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question.'"  United States v. Watson, 404 F.3d 163, 167 (2d Cir. 2005) (quoting United States v. Pena, 961 F.2d 333, 339 (2d Cir. 1992) (some quotation marks and alterations omitted)).  However, "'[g]eneral and conclusory factual allegations which are based upon mere suspicion or conjecture, however, will not suffice to necessitate a hearing.'"  Gentile v. Cty. of Suffolk, 926 F.2d 142, 148 (2d Cir.

1991) (quoting Cohen v. United States, 378 F.2d 751, 760 (9th Cir. 1967)).  Further, "if facts urged in support of a hearing would not entitle the moving party to relief as a matter of law, no evidentiary hearing is required."  Id. (quoting Cohen, 378 F.2d at 760).

Ultimately, the decision of whether to hold an evidentiary hearing is in the district court's discretion.  See United States v. Grant, No. 06 CR 732 (DLI), 2008 WL 111169, at *1 (E.D.N.Y. Jan. 8, 2008) ("However, even where the preliminary showing of facts requiring a hearing is weak, the court has discretion to determine whether to hold a suppression hearing.");  United States v. Shamsideen, No. 03 CR.1313(SCR), 2004 WL 1179305, at *9 (S.D.N.Y. Mar. 31, 2004) ("[I]t should be noted that District Courts have broad discretion when deciding whether or not to hold a suppression hearing.").

### 2. The Reasonableness of the Search

Although it is undisputed that the U.S. Probation and NYPD Officers entered the Defendant's alleged residence without a warrant, the Government contends that the search was "reasonable" under the Fourth Amendment because (i) the Defendant was on supervised release and therefore, had a lower expectation of privacy; and (ii) the U.S. Probation Officers had reasonable suspicion to suspect that the Defendant was in possession of a firearm.  (The Gov't Opp'n Ltr., Dkt. No. 15-cr-131, at 4–5.)

For his part, the Defendant does not dispute that on January 13, 2015, at the time of the search, he was on supervised release and subject to a condition that he "submit his person, residence, vehicle or place of business to a search if the Probation Department ha[d] reasonable belief [that] contraband [was] present."  (See Keating Aff. at ¶¶ 11–13.)  Rather, he contends that the discovery materials provided to him by the Government are "devoid of any indication that

the Probation Department possessed reasonable suspicion to conduct the Probation search."

(The Def.'s Reply Ltr., Dkt. No. 25 (the "Def.'s Reply Ltr.", at 1–2.)

"'Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable.'" United States v. Reyes, 283 F.3d 446, 462 (2d Cir. 2002) (quoting United States v. Knights, 534 U.S. 112, 121, 122 S. Ct. 587, 592, 151 L. Ed. 2d 497 (2001)).

Courts have repeatedly held that enforcing the conditions of probation or supervised release is a weighty government interest that in certain circumstances justifies an exception to the warrant and probable cause requirements.

For example, in Griffin v. Wisconsin, 483 U.S. 868, 871 107 S. Ct. 3164, 3167, 97 L. Ed. 2d 709 (1987), the defendant was convicted in state court and sentenced to a term of probation, which included a condition that a probation officer could conduct a search of a probationer's home "without a warrant as long as his supervisor approves and as long as there are 'reasonable grounds' to believe the presence of contraband." Id. at 871. After receiving a tip from a detective that there might be guns in the defendant's apartment, several probation officers, accompanied by state police officers, entered the defendant's home without a warrant and found a handgun. See id.

The United States Supreme Court affirmed the decision by the state court denying the defendant's motion to suppress because it found that the search was reasonable under the Fourth Amendment. See id. The Court reasoned that on the one hand:

> A State's operation of a probation system, like its operation of a school, government office or prison, or its supervision of a regulated industry, likewise presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements.

Id. at 873–74.  Also, the Court found that probationers have a diminished expectation of privacy because "[t]o a greater or lesser degree, it is always true of probationers (as we have said it to be true of parolees) that they do not enjoy 'the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions.'"  Id.at 874.

Balancing the State's strong interest in the operation of its probation system against the defendant's diminished right to privacy, the Court found that the "replacement of the standard of probable cause by 'reasonable grounds,' as defined by the Wisconsin Supreme Court, was justified.  Id. at 876–77.  However, the Court stopped short of holding that "any search of a probationer's home by a probation officer is lawful when there are 'reasonable grounds' to believe contraband is present."  Id. at 880.

Subsequently, in United States v. Knights, supra, the Supreme Court upheld a warrantless search of a probationer's residence by a state law enforcement officer pursuant to a condition of the defendant's probation which allowed any probation or law enforcement officer to search his residence without a warrant based on "reasonable cause."  Balancing the diminished privacy interest of the defendant as a result of his probation and the state's interest "in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise," the court found that the Fourth Amendment required "no more than reasonable suspicion to conduct a search of this probationer's house," which the Court defined as "a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable."  Id. at 120–21.  As the defendant conceded that the officer had reasonable suspicion to search his home, the Court upheld the search.  Id. at 122.

In United States v. Reyes, *supra*, the Second Circuit found that the reasoning of Griffin and Knights applied to searches conducted by probation officers of individuals subject to supervised release because "the overwhelming interest in ensuring that a parolee complies with [parole] requirements and is returned to prison if he fails to do so, . . . also exists in full measure with respect to a convicted person serving a term of federal supervised release." Id. at 462 (internal quotation marks and alterations omitted). Thus, the court concluded that "the probable cause requirements of the Fourth Amendment, which apply to a regular law enforcement officer executing a search warrant for an individual's home, simply do not apply to visits by probation officers to the homes of convicted persons serving a term of supervised release." Id. at 462. Applying these principles, the court affirmed a decision denying the defendant's motion to suppress evidence recovered by U.S. Probation Officers and agents from the Drug Enforcement Agency during a home-visit of the defendant's residence. See id. at 462.

Here, there is no dispute that the Defendant was on supervised release at the time of the search and subject to a condition permitting the search of his residence based on the "reasonable belief" that he possessed contraband. Thus, the Government had a weighty interest in enforcing this condition, and the Defendant had a diminished interest in privacy because he was aware of this condition. Therefore, a search of his residence by U.S. Probation Officers did not require a warrant supported by probable cause. See id. at 462 ("[T]he probable cause requirements of the Fourth Amendment, which apply to a regular law enforcement officer executing a search warrant for an individual's home, simply do not apply to visits by probation officers to the homes of convicted persons serving a term of supervised release."). Rather, the search by the U.S. Probation Officer was required to be supported by reasonable suspicion, a standard less onerous than probable cause. See United States v. Villegas, 928 F.2d 512, 516 (2d Cir. 1991) (noting that

the "reasonable suspicion" standard requires "considerably less than proof of wrongdoing by a preponderance" and the "totality of the circumstances must be considered").

According to the criminal complaint, on December 13, 2014, the Defendant shot John Doe twice, and on December 29, 2014, CI # 1 identified the Defendant as the shooter. (Compl. at ¶¶ 4, 6.). The Government does not appear to claim that U.S. Probation Officers were aware of these alleged events prior to searching the Defendant's home on January 13, 2015.

Rather, the Government asserts that prior to the January 13, 2015 search, the Defendant's wife and CI #1 informed Probation Officer Stickley of two separate purported incidents involving the Defendant: (i) on January 4, 2015, CI #1 witnessed the Defendant flashing a gun; and (ii) on January 12, 2015, the Defendant's estranged wife witnessed the Defendant pistol-whip a member of the Crypts Gang. (See the Gov't Opp'n Ltr., Dkt. No. 26, at 3, 4–5.)

The Defendant does not offer any affirmative evidence, such as an affidavit, disputing that these alleged incidents occurred. Instead, he asserts that the Government's version of events lacks support in the record, and therefore, he is entitled to an evidentiary hearing. (The Def.'s Reply Ltr., Dkt. No. 25, at 1–2.)

If Officer Stickley was provided with information from two witnesses that allegedly saw the Defendant pistol-whip a gang member and brandish his gun, the U.S. Probation Officers clearly had at least "reasonable suspicion" to believe that the Defendant possessed a firearm. That is because courts have routinely found specific information received by probation officers from confidential informants and eyewitnesses provides reasonable suspicion to justify a search. See, e.g., United States v. Townsend, 371 F. App'x 122, 125 (2d Cir. 2010) (Summary Order) ("Mercado's probation officer received specific information from law enforcement officials

working on an ongoing investigation that suggested contraband might be found in Mercado's home. The search did not violate Mercado's Fourth Amendment rights, and his suppression motion was properly denied."); United States v. Chirino, 483 F.3d 141, 148 (2d Cir. 2007) (finding that probation officers had reasonable suspicion to search a probationers residence because the officers "had information originating from a reliable informant that Bonilla, a 14-year-old-girl for whom a PINS warrant was outstanding, had been seen virtually every day for the past several days in the company of members of MS–13; that she had been sexually abused by numerous members of that gang; that a few days earlier, Bonilla had been seen with Chirino; and that Bonilla was perhaps being held against her will."); United States v. Washington, No. 12 CR 146 (JPO), 2012 WL 5438909, at *9 (S.D.N.Y. Nov. 7, 2012) (finding that probation officers had reasonable suspicion to conduct a warrantless search of a supervisee's home based on the fact that the probation officers possessed information from an FBI Agent that the defendant "had been caught on a wiretap discussing his role as a supplier of narcotics in a larger narcotics conspiracy.").

However, as the Defendant correctly points out, there are no allegations in the charging documents or in the record, such as affidavits by the officers who conducted the search, supporting the Government's assertions that Officer Stickley had this information prior to the January 13, 2015 search of the Defendant's alleged residence.  Indeed, the pre-search briefing prepared by the E.D.N.Y. Search Enforcement Team makes no mention of Officer Stickley, nor any incident prior to the search.  (See Keating Aff., Ex. D.).  Thus, to credit the Government's version of events leading up the January 13, 2015, the Court would have to rely entirely on the assertions made in its letter in opposition to the Defendant's motion.  Cf.  United States v. Rivera, No. 3:07CR285EBB, 2008 WL 2229917, at *8 (D. Conn. May 28, 2008) ("The Court

has relied only on facts drawn from the law enforcement reports attached to Rivera's Memorandum and has not relied on facts set out in the government's papers. Therefore, these belatedly manufactured factual disputes are immaterial.").

On the other hand, in support of his assertion that the Government lacked reasonable suspicion, the Defendant offers (i) his own affidavit, which does not dispute the incidents referenced in the Government's papers; and (ii) the affidavit of Keating, his counsel, which contains conclusory and unsupported assertions that U.S. Probation Officers lacked reasonable suspicion to conduct the January 13, 2015 search.

Such a weak showing clearly does not, by itself, warrant the suppression of the evidence discovered in the course of the search and ordinarily would not create a dispute of fact necessitating an evidentiary hearing with regard to the Defendant's motion. See Pena, 961 F.2d at 339 ("'An evidentiary hearing on a motion to suppress ordinarily is required if 'the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question.'") (quoting United States v. Licavoli, 604 F.2d 613, 621 (9th Cir. 1979)).

However, the Court is hesitant to deny the Defendant's request for a hearing based solely on assertions made by the Government in its papers, particularly when it is the Government's burden to justify the warrantless search of the Defendant's purported residence by a preponderance of the evidence. See United States v. Herron, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014) ("On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure . . . Once the defendant has met this burden, the burden then shifts to the government to demonstrate by a

preponderance of the evidence, . . . , that the search or seizure did not violate the Fourth

Amendment[.]") (internal quotation marks and citations omitted).

Accordingly, the Court, in its discretion, denies the Defendant's motion to suppress the

evidence discovered during the January 13, 2015 search without prejudice and grants the

Defendant's request for an evidentiary hearing solely on the question of whether U.S. Probation

Officers had reasonable suspicion to enter the Defendant's residence on January 13, 2015. See

United States v. Grant, No. 06 CR 732 (DLI), 2008 WL 111169, at *1 (E.D.N.Y. Jan. 8, 2008)

("[E]ven where the preliminary showing of facts requiring a hearing is weak, the court has

discretion to determine whether to hold a suppression hearing.").

The Court will now turn to the Defendant's assertion that suppression is also warranted

on a "stalking horse theory."

### 3. The "Stalking Horse" Theory

Several circuit courts have recognized the so-called "stalking horse" theory, under which

a probation officer may not use his authority to conduct a search to help law enforcement officers

evade the Fourth Amendment's usual warrant and probable cause requirements for police

searches and seizures. See, e.g., United States v. Watts, 67 F.3d 790, 794 (9th Cir. 1995),

judgment rev'd on other grounds, 519 U.S. 148, 117 S. Ct. 633, 136 L. Ed. 2d 554 (1997) ("A

probation officer acts as a stalking horse if . . . . probation officer used the probation search to

help police evade the Fourth Amendment's usual warrant and probable cause requirements.");

United States v. Cardona, 903 F.2d 60, 65 (1st Cir. 1990) ("The law will not allow a parole

officer to serve as a cat's paw for the police.").

However, as the Government correctly points out, the Second Circuit in <u>Reyes</u>, *supra*, explicitly rejected the "stalking horse" theory as a basis for suppressing evidence under the Fourth Amendment:

> The District Court held that the 'stalking horse' theory was inapplicable here because the probation officers were lawfully on the scene pursuant to a clear duty of visitation. The District Court thus relied on its view as to the likely parameters of the 'stalking horse' theory. To decide this appeal on that ground, we would have to assume arguendo that this ill-defined theory exists and then decide whether its parameters exclude the facts presented in this case. <u>Rather than hypothetically construct the theory and then limit the parameters of the hypothetical theory, we apply Occam's razor and decide that the doctrine is not a valid defense in this Circuit.</u>

<u>Reyes</u>, 283 F.3d at 463 (emphasis added). The Second Circuit rejected the "stalking horse theory" because it reasoned that "the objectives and duties of probation officers and law enforcement personnel are unavoidably parallel and are frequently intertwined." <u>Id.</u> Thus, the court found it "difficult to imagine a situation" where a probation officer conducting a search based on a tip from a law enforcement officer would be not be "pursuing legitimate supervised release objectives." <u>Id.</u>

The Defendant asserts that <u>Reyes</u> is not applicable to this case because <u>Reyes</u> involved the propriety of a home-visit, and this case involves a probation search, which the Defendant contends is a greater invasion of his Fourth Amendment rights than a home-visit. (<u>See</u> Keating Aff. at ¶¶ 16–18.)

However, the Second Circuit in <u>United States v. Newton</u>, 369 F.3d 659, 667 (2d Cir. 2004), explicitly rejected a similar attempt by a defendant to limit <u>Reyes</u> to home-visits:

> Newton attempts to distinguish <u>Reyes</u> on the ground that it did not involve a full search but only a less intrusive home visit. In fact, Reyes's rejection of challenges to coordinated efforts between probation/parole officers and other law enforcement officials turned not on the particular level of intrusion in that case, but on the legitimacy of the supervision objectives being pursued by the probation officers . . . As <u>Reyes</u> recognized, the duties and objectives of probation/parole

officers and other law enforcement officials, although distinct, may frequently be 'intertwined' and responsibly require coordinated efforts . . . . <u>In sum, we reiterate Reyes's rejection of stalking horse challenges and conclude that police presence at Ms. Wright's apartment on January 9, 2001, did not render the warrantless search constitutionally unreasonable</u>.

<u>Id.</u> (emphasis added).

Therefore, the Court is not persuaded by the Defendant's attempt to distinguish <u>Reyes</u> and finds that, as a matter of law, the Defendant's stalking horse theory is not a valid basis for the suppression of evidence in this Circuit. <u>See</u> <u>Washington</u>, 2012 WL 5438909 at *7 ("[I]t is crystal clear that the stalking horse theory is not a valid defense to warrantless searches of probationers, parolees, or individuals on supervised release in this Circuit."); <u>United States v. Taylor</u>, No. 06 CR. 529 JSR, 2006 WL 2789987, at *3 (S.D.N.Y. Sept. 26, 2006) ("The Second Circuit has held, however, that as a general matter 'the [stalking horse] doctrine is not a valid defense in this Circuit.'") (quoting <u>Reyes</u>, 283 F.3d at 463).

In reply, the Defendant requests that he be permitted to raise the theory again at the evidentiary hearing because he asserts the Government would not be prejudiced, and it would not "offend any notion of judicial economy" to permit him to raise the "stalking horse" again. (The Def.'s Reply Ltr., at 3.)

The Court disagrees. As noted above, the Defendant is not entitled to an evidentiary hearing "if facts urged in support of a hearing would not entitle the moving party to relief as a matter of law, no evidentiary hearing is required." <u>Gentile</u>, 926 F.2d at 148 (quoting <u>Cohen</u>, 378 F.2d at 760). Here, the Court finds that the Defendant's "stalking horse" theory fails as a matter of law, and thus, an evidentiary hearing on the issue would be inefficient and a waste of the resources of the Court and the Government.

Accordingly, the Defendant's motion to suppress on the basis of the "stalking horse" theory is denied with prejudice, and the evidentiary hearing will be limited solely to the question of whether the U.S. Probation Officer had reasonable suspicion to enter the Defendant's residence.

Below, the Court will address the Defendant's motion with respect to the identification evidence and a purported statement made by the Defendant following his arrest.

## B. As to the Identification Evidence

On December 29, 2014 and February 19, 2015, respectively, CI #1 and CI #2 separately identified the Defendant as the individual who shot John Doe twice from a photo array of six individuals. (See Compl. at ¶¶ 5, 6; Keating Aff. at ¶ 20.) Allegedly, CI #1 was present at the scene of the shooting, and CI #2 heard the Defendant state that he "put two" in John Doe several hours after the shooting. (Compl. at ¶ 6.)

The Defendant alleges that both identifications were unnecessarily suggestive and therefore, their admission in evidence at the trial would violate his Due Process rights. Thus, he seeks to suppress both identifications or in the alternative, requests an evidentiary hearing pursuant to United States v. Wade, 388 U.S. 218 (1967) addressing whether the identifications were reliable. (See Keating Aff. at ¶¶ 19–22.)

A pre-trial identification is excludable under the Due Process clause "if it was both produced through an unnecessarily suggestive procedure and unreliable." United States v. Bautista, 23 F.3d 726, 729 (2d Cir. 1994). "When a witness has made a pretrial identification, the analysis of whether he is to be permitted to identify the defendant at trial normally requires a one-step or two-step inquiry." United States v. Maldonado-Rivera, 922 F.2d 934, 973 (2d Cir. 1990).

"The first question is whether the pretrial identification procedures were unduly suggestive of the suspect's guilt. If they were not, the trial identification testimony is generally admissible without further inquiry into the reliability of the pretrial identification." Id. However, if the pretrial procedures were unduly suggestive, "the court must then weigh the suggestiveness of the pretrial process against factors suggesting that an in-court identification may be independently reliable rather than the product of the earlier suggestive procedures." Id.

With respect to the first question — as to whether the procedures employed were unduly suggestive —, "[i]t is well settled that the use of a photo array is not inherently suggestive, and its mere use will not prevent admission of the pre-trial identification or an in-court identification by the witness." United States v. Levy, No. 04-CR-559 (NGG), 2005 WL 2179650, at *2 (E.D.N.Y. Sept. 9, 2005).

Rather, the suggestiveness of a photo array "depends on a number of factors, including the size of the array, the manner of presentation by the officers, and the array's contents." Maldonado-Rivera, 922 F.2d at 974. "If there is nothing inherently prejudicial about the presentation, such as use of a very small number of photographs or of suggestive comments, the 'principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to suggest to an identifying witness that [that person] was more likely to be the culprit.'" Id. (quoting Jarrett v. Headley, 802 F.2d 34, 41 (2d Cir. 1986) (some internal quotation marks omitted)).

A request for a Wade hearing is generally granted where "'any question is raised concerning the suggestibility of the identification procedure.'" United States v. Wilson, 493 F. Supp. 2d 364, 382 (E.D.N.Y. 2006) (quoting United States v. Persico, CR–92–00351, 1994 WL 36367, *23 (E.D.N.Y. Jan. 28, 1994)); see also Watkins v. Sowders, 449 U.S. 341, 345, 101 S.

Ct. 654, 657, 66 L. Ed. 2d 549 (1981) ("The prudence of [conducting a <u>Wade</u>] hearing has been emphasized by many decisions in the Courts of Appeals, most of which have in various ways admonished trial courts to use that procedure."); <u>United States v. Rodriguez</u>, No. 00 CR. 949 (DAB), 2002 WL 313894, at *3 (S.D.N.Y. Feb. 27, 2002) ("[A] Wade hearing is advisable where there is a contention that the pretrial identification was the result of impermissibly suggestive procedures.").

Some district courts have denied a request for a <u>Wade</u> hearing where a defendant relies on conclusory and unsupported assertions of suggestiveness. <u>See</u> <u>United States v. Berganza</u>, No. S(4) 03 CR. 987 (DAB), 2005 WL 372045, at *10 (S.D.N.Y. Feb. 16, 2005) ("A defendant may not baldly request a <u>Wade</u> hearing; rather he must allege facts supporting his contention that the identification procedures used were impermissibly suggestive."); <u>Rodriguez</u>, 2002 WL 313894 at *3 (same); <u>United States v. Hamideh</u>, No. 00 CR. 950 (NRB), 2001 WL 11071, at *1 (S.D.N.Y. Jan. 3, 2001) ("The only distinguishing characteristic is that defendant Hamideh is smiling in his photo, while the other five individuals are not. This single difference cannot support even the threshold showing of suggestiveness that would require a hearing.").

However, ultimately, the decision of whether to hold a <u>Wade</u> hearing is left to the sound discretion of the trial court. <u>See</u> <u>Wilson</u>, 493 F. Supp. 2d at 383 ("While Wilson's claims of suggestivity are speculative at this point, he has raised a concern, and the most cautious route would be to address this issue at the <u>Wade</u> hearing to establish that the photo array procedures were not unduly suggestive.").

In the present case, the Defendant asserts that the photo array used by the NYPD was unnecessarily suggestive because the other five individuals depicted are significantly older than

the Defendant. Thus, he contends that the Defendant stood out from the other individuals and suggested that he was the most likely culprit. (Keating Aff. at ¶ 20.)

The Government asserts that the photo array was not unduly suggestive because (i) it contains six photos of males that fit the description of the Defendant; and (ii) both CI #1 and CI # 2 were familiar with the Defendant's appearance prior to the identification, and thus, the identifications were independetly reliable. (The Gov't Opp'n Ltr., Dkt. No. 26, at 6–7.)

The Defendant provides a copy of the photo array used by the NYPD. (<u>See</u> Keating Aff., Ex. F.) However, the copy is of a poor quality. Thus, the Court cannot determine whether the Defendant is distinguishable from the other individuals because of his age, as he contends, or if the pictures depict six males that are of a similar "fit and description," as the Government contends.

Even assuming that the Defendant's picture is somewhat younger than the other individuals, the Defendant offers no case law supporting his contention that such a distinction would render the photo array "'so unnecessarily suggestive and conducive to irreparable mistaken identification' as to be a denial of due process of law." <u>Richardson v. Superintendent of Mid-Orange Corr. Facility</u>, 621 F.3d 196, 202 (2d Cir. 2010). Further, even reviewing the somewhat inscrutable copy of the photo array provided by the Defendant, the Court can discern that there are six individuals used in the photo array, which is not an impermissibly small number of photographs for use in an identification array. <u>See</u> <u>United States v. Bennett</u>, 409 F.2d 888, 898 (2d Cir.) (six not impermissibly suggestive); <u>United States v. Adeniyi</u>, No. 03 CR. 0086 (LTS), 2003 WL 21146621, at *2 (S.D.N.Y. May 14, 2003) ("Six is not an impermissibly small number of photographs for use in an identification array.").

Further, there do**es** not appear to be any glaring differences in skin-tone or appearance in the pictures.  For instance, the array appears to be very different from the array that the Second Circuit in United States v. Fernandez, 456 F.2d 638, 641 (2d Cir.1972) found to be suggestive. There, the defendant was the only Black man depicted in the six-photograph array who had extremely light skin and an Afro haircut, and surveillance photographs depicted the perpetrator of the crime as an individual with such coloring and hair style.  See id. at 641.  Here, by contrast, there does not appear to be such drastic differences between the Defendant's picture and the picture of the other five individuals.  Therefore, the Defendant has failed to show that suppression of the identifications is warranted on the basis of the photo array he provided to the Court.

However, given that the poor quality of the copy of the photo array provided to the Court and the lack of any sworn affidavits or testimony from the Government regarding the procedures employed by the NYPD in conducting the photo array, the Court, in its discretion, finds that a Wade hearing is advisable.  Accordingly, the Court grants the Defendant's request for a Wade hearing.  See United States v. Walia, No. 14-CR-213 MKB, 2014 WL 2533848, at *3 (E.D.N.Y. June 5, 2014) ("While the government may be correct that neither the arrays nor the manner in which they were conducted was unduly suggestive, the Court has no sworn testimony from which it can conclude that the manner in which the arrays were conducted was not unduly suggestive . . . . Therefore, the Court will hold a hearing to address Defendant's motion as to the suggestiveness of the photographic arrays and procedures,"); Wilson, 493 F. Supp. 2d at 382-83 ("Given the preference in this circuit for pre-trial Wade hearings to ensure the protection of a criminal defendant's due process rights, I find that a Wade hearing is warranted in this case.").

**C. As to the Defendant's Purported Statement**

Following his arrest the Defendant allegedly made a statement to the NYPD Police Officers, "the phone is only WiFi and can't make calls." (Keating Aff. at ¶ 6.) The Defendant moves to suppress that statement because (i) he asserts that he made it in response to custodial interrogation by NYPD Officers; and (ii) it is undisputed that he was not given a <u>Miranda</u> warning prior to making the statement. (<u>Id.</u> at ¶¶ 23–26.) In the alternative, he seeks an evidentiary hearing because he contends there are disputes of fact regarding the questions posed by the NYPD Officers to him following his arrest. (<u>See</u> Keating Reply Ltr. at 3–4.)

In response, the Government does not dispute that NYPD Officers did not give the Defendant a <u>Miranda</u> warning prior to asking the Defendant about his cell phone. However, it asserts that suppression is unwarranted because "[t]he question posed by the officer, in connection with the cell phone, was not designed for the purpose of coercing the defendant into incriminating himself, but rather was simply a response to the defendant's request for the opportunity to make a phone call." (The Gov't Opp'n Ltr. at 6–7.)

"To protect the Fifth Amendment right against self-incrimination, the Supreme Court in <u>Miranda v. Arizona</u> ruled that police may not interrogate a suspect who has been taken into custody without first warning the person 'that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" <u>United States v. Newton</u>, 369 F.3d 659, 668 (2d Cir. 2004) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). "If a suspect is not so warned, the prosecution is barred from using statements obtained during the interrogation to establish its case in chief." <u>Id.</u>

Significantly, "[a] suspect is entitled to Miranda warnings only if he or she is interrogated while 'in custody.'" Tankleff v. Senkowski, 135 F.3d 235, 242 (2d Cir. 1998). "This determination has two parts: (a) there must be an interrogation of the defendant, and (b) it must be while she is in 'custody.'" United States v. FNU LNU, 653 F.3d 144, 148 (2d Cir. 2011).

Here, there is no dispute that the Defendant was in custody at the time he made the challenged statement. Rather, the dispute focuses on whether the challenged statement was in response to "interrogation" by NYPD Officers. "[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rosa v. McCray, 396 F.3d 210, 220-21 (2d Cir. 2005) (some internal quotation marks omitted). An "incriminating response" refers to "any response — whether inculpatory or exculpatory — that the prosecution may seek to introduce at trial." Rhode Island v. Innis. See 446 U.S. 291, 301 n. 5, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

Accordingly, "'[w]here statements are spontaneous — that is, where they are not the result of questioning or its functional equivalent — Miranda warnings are not necessary and the statements are not protected.'" United States v. Jacobson, 4 F. Supp. 3d 515, 532 (E.D.N.Y. 2014) (quoting United States v. Noble, No. 07 CR. 284 (RJS), 2008 WL 1990707, at *7 (S.D.N.Y. May 7, 2008)); see also Innis, 446 U.S. at 300 ("'Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.'") (quoting Miranda, 440 U.S. at 478).

In addition, the "'routine booking question exception . . . exempts from Miranda's coverage questions to secure the biographical data necessary to complete booking or pretrial

services' and that permissible questions include those that 'appear reasonably related to the police's administrative concerns.'" Rosa, 396 F.3d at 221 (quoting Pennsylvania v. Muniz, 496 U.S. 582, 601–02, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990) (alterations in original)).

The test for whether the questioning constitutes "interrogation" is objective, but the officer's subjective intent in asking the question is relevant to the inquiry. See id. ("The test [for interrogation] is objective. The subjective intent of the agent is relevant but not conclusive.") (parenthetically quoting United States v. Mata–Abundiz, 717 F.2d 1277, 1280 (9th Cir.1983)); see also United States v. Carr, 63 F. Supp. 3d 226, 238 (E.D.N.Y. 2014) ("[W]hile the analysis is properly focused on what the officer objectively should have known to be reasonably likely to elicit an incriminating response, see Innis, 446 U.S. at 302, 100 S.Ct. 1682, the subjective intent of an officer in asking a question is a relevant, though not conclusive, part of that inquiry.")

"On a motion to suppress in a criminal trial, the defendant bears the burden of demonstrating the basis for the motion — in this case, that he was subject to custodial interrogation." Carr, 63 F. Supp. 3d at 235 (citing United States v. Funaro, 253 F.Supp.2d 286, 293–94 (D. Conn. 2003)); see also United States v. Wyche, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004) ("On a motion to suppress evidence in a criminal trial, once Wyche establishes a basis for his motion, the burden rests upon the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers."). "Once a basis has been established, 'the prosecution has the burden of establishing by a preponderance of the evidence that a suspect waived his Miranda rights, and that his confession is truly the product of free choice.'" Carr, 63 F. Supp. at 235 (quoting United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991)).

As in the Fourth Amendment context described above, "'[a]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific,

detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question.'" United States v. Kantipuly, No. 06-CR-065E(F), 2006 WL 4046151, at *8 (W.D.N.Y. Oct. 16, 2006) (quoting Pena, 961 F.2d at 339).

In the present case, the Defendant filed an affidavit by Keating, his counsel, describing the circumstances leading to his challenged statement as follows:

> After purportedly recovering the contraband from the vehicle, a member of the New York City Policy Department brought the cell phone to Chandler who remained detained in his residence and asked Chandler, 'whether he wanted to use his cell phone' . . . , to which Chandler allegedly responded, 'the phone is only WiFi and can't make calls.'

(Keating Aff. at ¶ 6.)

According to the Defendant, the NYPD Officer's question was objectively designed to elicit an incriminating response from the Defendant because prior to asking the question, the Officer had recovered a cell phone from a vehicle parked outside the Defendant's alleged residence. (The Def.'s Reply Ltr. at 3–4.) Thus, according to the Defendant, the question was designed to confirm the Defendant's ownership of the vehicle, and thereby, the contraband found inside it. (Id.)

The Government offers a slightly different version of these events:

> [W]hile at the precinct, the defendant asked the police officer in possession of the cell phone recovered from his vehicle if he (Chandler) could make a call. The officer then asked the defendant, in sum and substance, whether he wanted to use his (the recovered) cell phone. The defendant responded, in sum and substance, that the phone is only WiFi (meaning had no cellular service) and can't make calls.

(Gov't Opp'n Ltr. at 7.) As the NYPD Officer's question was a response to the Defendant's initial question, the Government asserts that it was not reasonably likely to elicit an incriminating response. (See id.) Further, the Government asserts that the NYPD Officer's question was more

in the realm of a "booking type question" that does not fall within the ambit of <u>Miranda</u>. (<u>See id.</u>)

On the record before it, the Court is unable to determine whether the question allegedly posed by the NYPD Officer to the Defendant, "do you want to use your cell phone," was reasonably likely to illicit incriminating information. If, as the Government contends, the Defendant asked the Officer whether he could make a call, the Officer's question, "do you want to use your cell phone," appears to be a reasonable response to the Defendant's initial question and not a question designed to elicit incriminating information. See <u>United States v. McKeckney</u>, 29 F. App'x 627, 629 (2d Cir. 2002) (Summary Order) ("The few comments made by Investigator Epidy to defendant prior to defendant's admission that he possessed the firearm served to respond to defendant's questions and could not have reasonably been expected to elicit incriminating information from defendant.").

However, the Defendant disputes that he asked the NYPD Officer to make a call and instead contends that the Officer asked him an unprompted question as to whether he wanted to use his cell phone immediately after he discovered the phone in the vehicle parked outside the Defendant's alleged residence. (Keating Aff. at ¶ 6.) Under such circumstances, the Officer's question could be construed as reasonably likely to elicit an incriminating response from the Defendant establishing that he owned the vehicle in which the Officer had just discovered guns, drugs, and a scale. See <u>United States v. Zamora</u>, 42 F. Supp. 3d 397, 400 (N.D.N.Y. 2014) (finding an officer's question, is there anything he could "help" the defendant with, to be reasonably likely to illicit an incriminating response under the circumstances); <u>Carr</u>, 63 F. Supp. 3d at 238 ("The CBP officers should have known that their questions regarding Carr's traveling companions were 'reasonably likely to elicit an incriminating response' from Carr.")

Further, the Court is not persuaded by the Government's attempt to analogize the NYPD Officer's questions to routine booking questions. Routine booking questions are those designed to elicit an arrestee's pedigree, such as the arrestee's name, aliases, date of birth, address, place of employment, and marital status. See United States v. Rodriguez, 356 F.3d 254, 259 n. 2 (2d Cir. 2004) (""Routine questions about a suspect's identity and marital status, ordinarily innocent of any investigative purpose, do not pose the dangers Miranda was designed to check; they are rather the sort of questions 'normally attendant to arrest and custody.'") (quoting United States v. Gotchis, 803 F.2d 74, 79 (2d Cir. 1986)); United States v. Nogueira, No. 08-CR-876 (JG), 2009 WL 3242087, at *2 (E.D.N.Y. Oct. 6, 2009) ("Although the complete list of routine booking questions is not clear from the case law, there are certain questions that are so central to the booking and bail process that their permissibility cannot be in doubt. It must be that questions asked at the time of booking regarding an arrestee's name, aliases, date of birth, address, place of employment and marital status fall within the purview of this exception.").

Here, by contrast, the question allegedly posed by the NYPD Officer, "do you want to use your cell phone," did not relate to the Defendant's pedigree information, nor was it posed in the context of "booking" the Defendant. Thus, the Court cannot say, particularly on the sparse record before it, that the routine booking exception is applicable to this case.

Therefore, the differing accounts offered by the parties of the circumstances leading to the Defendant's challenged statement present a classic dispute of material fact, which the Court can only resolve with the benefit of an evidentiary hearing. Accordingly, the Court grants the Defendant's request for an evidentiary hearing to determine whether the Defendant's challenged statement was the product of custodial interrogation.

## III. CONCLUSION

For the foregoing reasons, the Defendant's request for an evidentiary hearing is granted with respect to the following issues: (i) whether the January 13, 2015 search was supported by reasonable suspicion; (ii) whether the photo array was unduly suggestive; and (iii) whether the Defendant's statement, "the phone is only WiFi and can't make calls," was the product of custodial interrogation.

In addition, the Defendant's motion to suppress is denied without prejudice and with leave to renew following the conclusion of the evidentiary hearing. However, the Court notes that it finds that the Defendant's use of the "stalking horse" theory to invalidate the January 13, 2015 search fails as a matter of law and therefore, cannot form the basis of a renewed suppression motion following the evidentiary hearing.

The parties are directed to appear before United States Magistrate Judge Steven I. Locke for an evidentiary hearing on March 16, 2016. The parties should contact Judge Locke's chambers if they have issues regarding the proposed hearing date.

If following the evidentiary hearing, the Defendant renews his motion to suppress, the Court respectfully refers that motion to Judge Locke for a report and recommendation as to whether the Defendant's motion should be granted.


**SO ORDERED.**
Dated: Central Islip, New York
February 12, 2016


*/s/ Arthur D. Spatt*
ARTHUR D. SPATT
United States District Judge

32